IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 1, 2021

**ERROL JOHNSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 14-00889     J. Robert Carter, Jr.,  Judge**

———

**No. W2020-00184-CCA-R3-PC**

———

The Petitioner, Errol Johnson, appeals as of right from the Shelby County Criminal Court's denial of his petition for post-conviction relief, wherein he challenged his convictions for aggravated child neglect and criminally negligent homicide.  On appeal, the Petitioner asserts that he was denied the right to represent himself at trial and that he received the ineffective assistance of trial counsel because counsel failed to advise him that the State could introduce rebuttal evidence after he testified.   Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ. joined.

Robert Harris Golder (in second amended post-conviction petition, at post-conviction hearing, and on appeal), Memphis, Tennessee; and Jessica Leigh Gillentine (in first amended post-conviction petition), Bartlett, Tennessee, for the appellant, Errol Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

*I.     Trial and Direct Appeal*

The Petitioner was convicted by a Shelby County jury of two counts of aggravated child neglect and two counts of criminally negligent homicide related to the November 24, 2012 death of his twelve-year-old daughter.[1]   State v. Errol Johnson, No. W2016-00839-

---

[1] The Petitioner, the victim's mother, Raven Ruth, and a home health care worker, Chasara Jones, were all

CCA-R3-CD, 2017 WL 3600465, at *1 (Tenn. Crim. App. Aug. 21, 2017). The trial court merged the two counts of aggravated child neglect and the two counts of criminally negligent homicide to reflect one conviction for each offense and imposed an effective sentence of twenty-two years in confinement.[2]

The evidence presented at trial established that in February 2011, the victim was hospitalized twice at Le Bonheur Children's Hospital ("Le Bonheur") due to an infection of unspecified origin.[3] Johnson, 2017 WL 3600465, at *5. During her second hospitalization, she developed septic shock and "multiple organ failure requiring vasopressors." In an effort to save her life, her doctors administered medications that damaged the circulation in her legs and feet. Her doctors discussed the possibility of amputation with the victim and her parents, but they asked to defer the decision until the victim could see a psychologist. However, the victim's parents canceled the appointment and chose to take the victim home. The victim's parents also canceled several specialist appointments after the victim's discharge. The victim attended one October 2011 appointment at a wound care clinic, and a home health care worker visited the victim until November 14, 2011, after which the Petitioner called and told the company to stop the visits. On the day of the victim's death about one year later, the victim became unresponsive, and the Petitioner and the victim's mother called 911 and attempted CPR. Multiple police officers, an emergency medical technician, and an emergency room technician testified about the filthy state of the Petitioner's home and the victim's wounds. On direct appeal, this court summarized this proof as follows:

> Those witnesses who entered the [Petitioner's] home on November 24, 2012, testified that the home smelled even when one was outside the home and that the smell increased as one entered the home and moved towards the victim's room. They described the smell several ways— "horrific odor," "smelled like death," "smell [that] took your breath away," "real putrid," "rotting flesh," "smelled like a gangrenous wound," "wretched smell," "putrid odor associated with death," and "rotten flesh or a dead animal." Even the [Petitioner] acknowledged his home smelled.

---

charged with two counts of aggravated child neglect and two counts of first degree felony murder. Johnson, 2017 WL 3600465, at *1. After the Petitioner's trial, the two co-defendants entered guilty pleas.

[2] The trial court initially ordered 100% service; however, on direct appeal, this court concluded that the trial court erred because the offenses were not enumerated in Tennessee Code Annotated section 40-35-501(i)(2), governing release eligibility. See Johnson, 2017 WL 3600465, at *1. On remand, the trial court determined that the Petitioner was a Range I, standard offender and imposed the appropriate 30% release eligibility.

[3] In the Petitioner's police statement, he theorized that the victim, who was allergic to shellfish, had an reaction to possibly contaminated food she ate at a restaurant in January 2011.

Additionally, several witnesses, when questioned about the state of the victim's room, noted such things as numerous fly strips hanging in the room that were full of flies; the floor was brown, dark, and sticky; the victim's mattress was black and heavily soiled; and there were soiled rags and soiled and bloody bandages on the floor.

. . . .

Each of the first responders to the 911 call immediately noticed the numerous sores and wounds to the victim's legs and backside. They also noticed the thick bandages on the victim's feet and the soiled compression boots.

Johnson, 2017 WL 3600465, at *9-10.

The emergency room technician who removed the bandages around the victim's legs and feet testified that layers of clean bandages had been wrapped on top of soiled ones, that the lower legs were so decayed that little to no flesh remained, and that fragments of bone and maggots fell out of the bandages. Johnson, 2017 WL 3600465, at *2. The victim's autopsy also reflected that her compression boots were stained and contained maggots. The forensic pathologist noted ulcerations on the victim's back, buttocks, and inner thighs, as well as gangrenous ulcers on her lower calves. He opined that the victim's wounds would have been extremely painful and that she died as a result of neglected care, including "infected decubitus ulcers, gangrene of the lower extremities, obesity, and hypertension."

Dr. Karen Lakin, an expert in child abuse pediatrics who reviewed the victim's medical records, testified that the portion of the victim's gangrenous tissue that was still alive would have been extremely painful because the nerve endings were exposed. Johnson, 2017 WL 3600465, at *10. Dr. Lakin added that the victim's bed was soiled and soaked in urine, which was generally acidic, making the combination of the exposed nerve endings and the bedding "excruciating." Dr. Lakin also concluded that the victim would have been aware of her injuries and capable of communicating her pain to her parents.

The Petitioner's statement to police was introduced as an exhibit, and he also testified at trial. Johnson, 2017 WL 3600465, at *4, 6-7. His statement and testimony were generally consistent. The Petitioner maintained that the victim's death was the result of improper medical care at Le Bonheur, specifically arguing that the doctors should not have given the victim heparin. The Petitioner noted in his testimony and to a detective that he considered suing the hospital. He described futile efforts to meet with a hospital administrator, the hospital's "kick[ing]" the victim out less than one week after she was in

intensive care, and home health care workers who "would pull in front of the house, but drive off without even knocking on the door." The Petitioner also argued that the victim's death was the fault of her mother, who was the victim's primary caregiver because the Petitioner worked twelve hours per day, seven days per week. The Petitioner claimed that he instructed the victim's mother to give him a daily written report of the victim's care and condition. The Petitioner asserted that he was unaware of the victim's deteriorating health until the day she died, when he came home after being away for thirty-six hours and found the victim's mother in the kitchen holding a pistol to her head and saying she was sorry. When the Petitioner checked on the victim in her bedroom, she was unresponsive. The Petitioner stated that he saw the victim's sores for the first time as he performed CPR. He maintained that he had "no idea" the victim was so ill and stated that he was angry, disappointed, and shocked at the victim's condition. He acknowledged that his house smelled, but he denied knowing the source or that the smell became stronger over time. The Petitioner noted that they had a "fly problem" in the house and denied that he had ever seen flies or maggots on the victim.

In rebuttal, the State called as a witness Elesia Turner, the director of risk management at Le Bonheur. She testified that during one of the victim's hospital stays, she met with the Petitioner for more than one hour because he was dissatisfied with the victim's care. Johnson, 2017 WL 3600465, at *7. She offered the following solutions: send the victim to Vanderbilt Children's Hospital at Le Bonheur's expense; transfer the victim to Le Bonheur's pediatric intensive care unit because the family liked the staff there; arrange for the Petitioner and the victim's lead doctor to review her records page by page; and transfer the victim to a rehabilitation facility. The Petitioner refused the transfer to Vanderbilt or to a rehabilitation facility, and he declined the transfer back to intensive care because they would have to "pack up." Finally, the Petitioner made an appointment to meet with the lead doctor but later canceled it. Ms. Turner stated that the Petitioner was ultimately banned from the hospital for using foul language and aggressive behavior.

Upon this evidence, the Petitioner was convicted of two counts of aggravated child neglect and two counts of the lesser-included offense of criminally negligent homicide. After a sentencing hearing and merger of the convictions to reflect one conviction for aggravated child neglect and one conviction for criminally negligent homicide, the trial court imposed an effective twenty-two-year sentence. The trial court applied Tennessee Code Annotation section 40-35-501(i)(2) regarding release eligibility and ordered one hundred percent service.

In the direct appeal of his convictions, the Petitioner disputed the sufficiency of the evidence relative only to aggravated child neglect, arguing that the State had not proven a "continual course of neglectful conduct." Johnson, 2017 WL 3600465, at *8. In addition,

-4-

the parties agreed that the trial court erred in its calculation of the Petitioner's release eligibility because aggravated child neglect was not an statutorily enumerated offense requiring one hundred percent service. See Tenn. Code Ann. § 40-35-501(i)(2). This court concluded that the evidence was sufficient as to aggravated child neglect, agreed with the parties that the one hundred percent release eligibility was improperly imposed, and remanded the case for resentencing. Although the resentencing hearing transcript is not included in the record, the trial court entered corrected judgment forms on June 7, 2018, reflecting the same effective sentence with a thirty percent release eligibility.

## II.      Post-Conviction Proceedings

On October 17, 2018, the Petitioner filed a pro se petition for post-conviction relief, raising numerous constitutional complaints. After first post-conviction counsel was appointed, the Petitioner filed a December 17, 2018 amended petition alleging several grounds of ineffective assistance of trial counsel. Subsequently, first post-conviction counsel obtained State employment and withdrew. Second post-conviction counsel was appointed and filed a July 25, 2019 second amended petition, in which the Petitioner alleged that he was denied the right to self-representation and that trial counsel provided ineffective assistance by failing to warn him of the State's ability to present rebuttal proof if he chose to testify.

### a.  Evidentiary hearing

At the post-conviction hearing, the State objected to the freestanding self-representation issue, noting for the post-conviction court that the Petitioner had not raised the issue on direct appeal. Post-conviction counsel responded,

> First of all, that could then be couched as a question of ineffective assistance of appellate counsel and the issue still stands on its merits and also I think that the conversations leading . . . up to the question of this being raised I think, also, go to ineffective assistance of trial counsel.
>
> I do believe that this is an independent, on constitutional grounds, but I think it can also be expressed within the --

The post-conviction court interrupted and asked the parties whether a self-representation issue was raised before the Petitioner's trial, and the State responded that it was raised "just prior to trial." Post-conviction counsel added that it was also raised two years before trial.

The post-conviction court stated that it would hear "[the Petitioner's] scoop on it," but noted that the Petitioner should have raised the issue on direct appeal.

The Petitioner testified that he decided in August 2014 that he wanted to represent himself because at the time, he "felt things were not going to work out properly, because there was evidence that . . . was not going to get heard, . . . it being close to trial." He affirmed that the State made an offer of fifteen years at thirty percent service and that he felt "pressure" to accept it, which "brought [him]" to the decision to represent himself. The Petitioner noted his position that he was not guilty because he did not kill the victim or "personally neglect" her.

The Petitioner identified a transcript of an August 6, 2014 pretrial hearing in which he told the trial court he wanted to "terminate" trial counsel and "become a pro se litigant and be assigned another attorney." The trial court denied the Petitioner's request, noting the serious nature of the charges. The trial court stated that the Petitioner could address the matter again at a hearing scheduled in September 2014, when the trial court would warn the Petitioner of "every pitfall" involved. The trial court opined that proceeding pro se was unwise, and it stated that it would hold the Petitioner to the same standard as a licensed attorney. The Petitioner acknowledged that he had no legal background and requested elbow counsel. The trial court responded that elbow counsel was only permitted to "answer a few questions" and could not help the Petitioner "right in the middle of something." The trial court asked trial counsel to provide the Petitioner with a copy of State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000), in which a defendant in a murder trial "insisted" on representing himself. The trial court acknowledged that the constitution dictated that it had "to at least hear [the Petitioner] out and listen," but it reiterated that proceeding pro se was "a terrible idea." The trial court requested that the Petitioner cooperate with trial counsel, whom the court noted had the Petitioner's "best interest at heart" and was "working as hard as he [could]" on the Petitioner's behalf.

A transcript from a Friday, January 8, 2016 pretrial hearing was also received as an exhibit and reflected that the Petitioner's trial was set for the following Monday, January 11. Trial counsel informed the trial court that he had attempted unsuccessfully to visit the Petitioner "over the last few days." According to counsel, the Petitioner refused to meet with him, and the Petitioner told the jail that he had fired counsel and had no attorney. The Petitioner stated that he "disqualified . . . and terminate[d]" trial counsel and that he did not have a new attorney "at this time." When the trial court asked the Petitioner why he decided not to cooperate with counsel after about one year of trial preparation, the Petitioner noted his August 2014 attempt to fire trial counsel. The trial court stated that it would not allow counsel to withdraw, that it was not "up to" the Petitioner to "terminate an attorney," and that the trial court appointed counsel and directed the Petitioner to cooperate with him. The trial court noted that the Petitioner's not wanting counsel to represent him was "really not

a reason for [the court] to disqualify him." The trial court emphasized that the Petitioner was charged with murder, that he faced a life sentence if convicted, that he needed help, and that counsel had worked as hard as he could on the Petitioner's case. The trial court asked the Petitioner again to cooperate with counsel. The Petitioner opined that counsel had not worked as hard as he could. The trial court stated that the trial would go forward as scheduled and advised the Petitioner that he was "hamstringing" counsel if he refused to work with him.

Continuing his post-conviction hearing testimony, the Petitioner stated that at some point, a different attorney from the Public Defender's Office visited the Petitioner in jail because the Petitioner went on a hunger strike. The Petitioner told the attorney that one of the conditions to end the hunger strike was "trying to remove" trial counsel. According to the Petitioner, the attorney told him that trial counsel was "running for Judge," and the Petitioner noted that he did not want counsel representing him on "a case of this magnitude [while] the guy [was] running for public office." The attorney responded that if trial counsel lost the election, he would remain the Petitioner's attorney, but that if counsel won the election, the Petitioner would be appointed another attorney. The Petitioner opined that the situation did not "sound fair" to him.

The Petitioner stated that he chose to testify at trial because exculpatory evidence like unspecified photographs and a "health department study" would not be presented. The Petitioner stated that he wanted "for the jury to be afforded the opportunity to see the other side of this story, or the other parts [that were] missing in the story." The Petitioner noted for the court that the jury needed to be aware that heparin had "constantly poison[ed]" the victim's system. The Petitioner affirmed that he spoke to trial counsel about testifying and that counsel told him the State would "lead" the Petitioner and "bring [him] into areas that were stressful" in an effort to "turn [his] words[.]" The Petitioner denied that counsel told him about the possibility of rebuttal testimony, and he did not think counsel was aware of potential rebuttal witnesses. The Petitioner averred that he thought he would be "the final witness to the whole ordeal" and that if he knew the State could have "the ammunition to twist whatever [he] said and then have the final word on it," he would not have testified.

On cross-examination, the Petitioner testified at the time of the August 2014 hearing, trial counsel was the only attorney representing him. The Petitioner stated that about one month after counsel was appointed to his case, he heard from other inmates that counsel was running for a judgeship and that he asked counsel about it. According to the Petitioner, counsel denied the rumor; however, the attorney who visited the Petitioner during his hunger strike confirmed it. The Petitioner commented that when he discovered counsel was, in fact, running for election, "at that point, I mean, come on, what would you do?" After the visit, two additional attorneys joined the Petitioner's defense team.

-7-

The Petitioner testified that he was not interested in the State's plea offer, and he stated that the offer was contingent on the co-defendant Ruth's also accepting it. He noted that co-defendant Ruth refused to accept the offer. The Petitioner stated that trial counsel brought a third attorney, William Johnson,[4] to a jail visit and that the Petitioner "took exception" to Mr. Johnson's presence. The Petitioner elaborated, "[Mr. Johnson] p---ed me off . . . because he got in my face" and asked him questions such as, "You know what this looks like, you know what you did[.]" The Petitioner commented that he would always think about what he could have done differently because he lost his daughter, but that counsel's decision to bring in Mr. Johnson and "badger" the Petitioner as though they were "in a trial and he[ was] the prosecuting attorney" made the Petitioner "unacceptable to any kind of deal[.]"

The Petitioner testified that from the beginning of his case, he had been adamant that he would not enter a plea admitting his guilt and that he told the trial court as much during a pretrial hearing. He agreed that no amount of discussion with his attorneys would have changed his mind. The Petitioner noted that "it didn't matter what [he was thinking]" because he was facing a maximum sentence of seventy-six years without the possibility of parole. He acknowledged his twenty-two-year sentence. The Petitioner agreed that both co-defendants pled guilty after his conviction at trial.

The Petitioner testified that he raised the self-representation issue again at the January 8, 2016 pretrial hearing because he could not work with his attorneys, whom he claimed were "making decisions" with which he disagreed. The Petitioner felt that he was "going to lose [his] life based" upon those decisions. The Petitioner stated that trial counsel and co-counsel advised him about his right to testify. According to the Petitioner, trial counsel felt that if the Petitioner testified, "the jury would get to hear [his] side and hear it from a person going through this, instead of all these people on the outside[.]" The Petitioner noted that most of the witnesses never came into contact with him, and he agreed that his testimony was the only way the jury would hear his version of events. He stated that trial counsel did not tell him the disadvantages of testifying, although he acknowledged that counsel discussed the cross-examination process. The Petitioner denied that counsel informed him that the State could present rebuttal witnesses if he testified. The Petitioner believed that after the State closed its proof, "that was the close," and he did not know "that they would come in and bring someone in to . . . regurgitate . . . and reverse everything that [he] said." The Petitioner agreed, though, that after discussing his proposed testimony and cross-examination, he decided with counsel that he would testify.

On redirect examination, the Petitioner testified that he asked for a new attorney for the first time in court because after he discovered that trial counsel was running for judge,

---

[4] William Johnson had no relation to the Petitioner.

he "didn't feel like [he] had any responsibility" to discuss the matter with counsel. The Petitioner affirmed that he spoke to five attorneys from the Public Defender's Office about his case, including the three attorneys on his defense team, Mr. Johnson, and the attorney who visited the Petitioner during his hunger strike. The Petitioner opined that Mr. Johnson "badgered [him] . . . about trying to get [him] to sign the deal."

Trial counsel testified that he had worked for the Shelby County Public Defender's Office since December 2006, and that during this time, he had tried between twenty and forty felony cases, including ones involving Class A and Class B felonies. Before the Petitioner's trial, he had tried one second degree murder case. Counsel stated that he was the only attorney of record for the Petitioner and that he asked two of his coworkers to assist with "specific needs." Specifically, one of the two assisting attorneys was formerly part of the office's capital defense team and had tried many first degree murder cases; she was also "very astute" with medical issues and helped review the victim's "very detailed" hospital and home health care records. Counsel noted the defense theory that the hospital contributed to the victim's death or "wasn't helpful" and that the home health care agency and co-defendant Jones were "primarily responsible" for the victim's death along with co-defendant Ruth.

Trial counsel testified that co-defendant Jones was the defense's "primary focus" because she had been assigned to care for the victim, clean her, and "take any steps necessary . . . independent from anything else, because she was there three to five times a week." He opined that the Petitioner and co-defendant Ruth were "great parents" and did everything possible to help the victim and obtain medical care after her initial illness. Counsel said that the victim's parents were distraught when the victim's doctors recommended amputation and that they believed the hospital was responsible for the situation. Counsel reviewed all of the discovery materials with the Petitioner and discussed with him issues between the Petitioner and the hospital staff, including a meeting the Petitioner had with the hospital.

Trial counsel testified that the Petitioner and co-defendant Ruth decided to take the victim home against medical advice and that the victim required a large amount of at-home care. Counsel stated that he recalled the details of the Petitioner's case because he spent a lot of time working on it and conferring with the Petitioner. Counsel stated that no issue related to the judicial election affected his visiting the Petitioner, discussing the evidence, reviewing the Petitioner's options, and discussing potential pleas "ad nauseum[.]"

Trial counsel testified that in his opinion, the case should not have gone to trial because of the photographic evidence, the allegations, and the potential convictions for first degree murder and aggravated child neglect. Counsel noted the consistent witness testimony about the conditions inside the Petitioner's home, which he characterized as the

"most damning proof" in the trial. Counsel stated that he had no reason to dispute the witnesses' descriptions or the adjectives they used.

Trial counsel testified that he "would like to think" the defense strategy, that the Petitioner had a lower level of responsibility for the victim's caretaking, was successful. Counsel opined that they elicited more sympathy for the Petitioner during his testimony than the State elicited for the victim. Counsel stated that the Petitioner gave "compelling statements about what he went through and experienced" and that multiple jurors were "visibly shaking and crying" based upon his description of what happened to the victim. Counsel said that they presented proof that the Petitioner was the sole breadwinner for the family and took out payday loans to support them.

Trial counsel testified that the home health care agency where co-defendant Jones worked was investigated, stripped of its state licensure, and closed; as a result, any witnesses from the agency had moved away or pled the Fifth Amendment when called to testify. Counsel stated, though, that they interviewed other employees and officers of the company, who tried to shift responsibility to co-defendant Jones and did not provide any information that would benefit the Petitioner. Counsel noted his belief that co-defendant Jones had forged documents and had done "things . . . nefariously to get her payment for that week[.]" Counsel said it was an "understatement" that the potential criminal and civil liability of the home health agency employees made it difficult to persuade them to help the defense. Counsel characterized the issue as a lack of cooperation rather than a lack of investigation.

Trial counsel opined that he and the Petitioner had an "okay" relationship, which became tense at times, but that they shared a "great" rapport and spoke freely during their visits. Relative to Mr. Johnson, trial counsel testified that he only worked on first degree murder cases and that he had handled many trials. Trial counsel explained that he wanted Mr. Johnson to prepare the Petitioner for "the kind of things that would face" him. Counsel acknowledged that Mr. Johnson's questioning was performed "in a frank, coarse manner." Counsel noted that all of the information he had received indicated that the Petitioner "had a bad temper" and that the exercise was meant to make the Petitioner aware that the prosecutor would try to upset him. Counsel told the Petitioner that the witnesses could testify about his demeanor in previous meetings, which was documented in records as "an attitude" or a frightening response. Counsel reiterated that because liability was at issue, the hospital documented every interaction with the Petitioner and his family. Counsel stated that the Petitioner expressed "natural" and "organic" anger toward the hospital and the medical professionals that counsel believed was beneficial to his case.

Trial counsel testified that he worked hard to elicit a plea offer from the State and that in his opinion, the State could obtain a conviction for aggravated child neglect but not

one for first degree murder. He noted that the prosecutor was "very reasonable." Counsel stated that "the thing that changed the whole trial" was the description of the deceased victim's legs once the layers of bandages were removed, which indicated that the victim was completely immobile. Counsel was concerned about the jury's reaction to the graphic evidence of the victim's injuries, the foul odor and poor condition of the house, and the filthy state of the victim's bedroom. Counsel stated that the victim's immobility showed that the Petitioner had some knowledge of her condition because he hung fly strips in the victim's bedroom. Counsel said that he discussed the State's plea offer many times in the months before the trial. Counsel stated that he discussed with the Petitioner "what could happen" based upon the anticipated evidence. Counsel opined that the State's offer of fifteen years was fair, but he added that the Petitioner "could have gotten better." Counsel agreed that the Petitioner rejected the offer, and he added that the Petitioner "immediately" rejected the offer again when counsel "voir-dire[d]" him just before the trial. Counsel noted that the Petitioner thought he was innocent and that the State would not be able to prove his guilt.

Trial counsel testified that the defense team "did a great job" and accomplished an "astonishing feat" of obtaining a conviction for criminally negligent homicide, given that the jury convicted the Petitioner of aggravated child neglect, the underlying felony to support first degree felony murder. Relative Ms. Turner's rebuttal testimony, counsel stated that he did not consider her description of the Petitioner's angry demeanor harmful because it was a reasonable reaction to his circumstances. Counsel noted his impression that contradictory to Ms. Turner's claim, Le Bonheur only offered to move the victim to Atlanta, not Vanderbilt. Counsel opined that the Petitioner was "overcharged" and that his case went to trial because he was the least culpable of the three co-defendants. Counsel stated that after the Petitioner's trial, the co-defendants pled guilty to "high sentences, higher crimes."

On cross-examination, trial counsel agreed that he had nothing bad to say about the Petitioner. He explained that although they "had [their] fights," he understood that the Petitioner's situation was serious. Counsel stated that they met on many occasions, that counsel relayed messages to the Petitioner's family, that counsel obtained "videos" and family photographs, and that counsel spent a lot of time with the Petitioner reviewing the evidence. When asked whether the Petitioner had a "bad temper," counsel clarified that the State's evidence was presented to portray the Petitioner as angry. Counsel stated that the Petitioner felt "a lot of anger as to the people he felt [were] responsible" for the victim's death. Counsel said that during some jail visits, the Petitioner "would get upset. He would bang his hands on the table, he would curse." However, counsel considered it a "natural reaction" and did not take offense.

Trial counsel testified that he never sought to make the Petitioner angry during jail visits until he brought in Mr. Johnson to prepare the Petitioner for "the evidence that would be thrown in his face[.]" Counsel said that the Petitioner knew "every piece of evidence" and documented "dates, times, events, [and] people present." According to counsel, the Petitioner knew he had a meeting with "people at the hospital" and that "there was that potential for that information getting elicited, based on anyone testifying, involved in that meeting." Counsel added that the Petitioner was "familiar and in depth and aware of everything that came in each document" and that the Petitioner told counsel about a specific document in which the meeting with Ms. Turner was documented. Counsel acknowledged that the meeting was not discussed in the State's case-in-chief. He stated that he and the Petitioner discussed every meeting and "everything in any report" in the "maybe tens of thousands" of discovery documents. Counsel stated that in each meeting preparing the Petitioner for trial, they discussed the evidence, the potential testimony, what could happen at the trial, and whether jury would believe or accept the evidence.

Trial counsel testified that he thought the Petitioner was "a great witness" based upon his lack of a criminal record and that the Petitioner was "a doting father, a good father, he had traditions, he was intelligent, he was a hard worker, [and] he was the sole bread winner." Counsel stated that they also discussed "the drawbacks of that testimony." Counsel said that he prepared the Petitioner to testify "in the months and years" leading up to the trial. Counsel affirmed that the defense knew exactly what the State's proof would be when they prepared the Petitioner to testify. Counsel reiterated that based upon the voluminous discovery materials, which the Petitioner reviewed "ad infinitum," they knew the evidence the State would present. Counsel stated that the Petitioner decided to testify before the trial and that they may have briefly discussed it again after the close of the State's evidence.

Trial counsel acknowledged that in 2014, he ran for a judgeship. When asked whether he told the Petitioner about his candidacy, counsel stated, "He would never have been a party to any consideration about decisions that I had on a personal level." Counsel noted that if he had been elected, he would still have represented the Petitioner at trial if it occurred prior to his swearing-in ceremony. Counsel denied that he had discussed the situation with "the ethics board." Counsel commented that he represented the Petitioner for a lengthy period of time, that they had built a relationship, and that he did not "like to lay off work on other people." Counsel affirmed that the Petitioner discussed the election with him. Counsel did not know how the Petitioner found out about counsel's candidacy, but he noted the Petitioner's request for a new lawyer in August 2014, the month of the election. Counsel stated that the election caused "no drop off in [their] relationship," in counsel's court appearances, his discussions with the Petitioner about the evidence, or the Petitioner's receiving the discovery materials.

Post-conviction counsel argued relative to the Petitioner's right to self-representation that a "break-down of communication" occurred in "large part" due to trial counsel's judicial candidacy and "not being forthcoming with that." Post-conviction counsel noted that after the Petitioner sought to proceed pro se, "more and more lawyers ke[pt] getting involved . . . which [was] the exact opposite of what he was looking for." Relative to the Petitioner's decision to testify, post-conviction counsel argued that trial counsel did not make "a clear connection between the decision to testify and the potential for rebuttal proof." Post-conviction counsel averred that trial counsel failed to explain the concept of rebuttal proof and that as a result, the Petitioner was "opening up for damning rebuttal proof that would further corroborate the anger and all the other . . . character attributes that . . . they were trying to not have come out."

The State responded that trial counsel prepared the Petitioner to testify, that no evidence had been presented to indicate that the election affected trial counsel's representation, and that trial counsel thoroughly discussed with the Petitioner the evidence, including the witness statements about the Petitioner's angry demeanor and how the defense would use that anger to the Petitioner's advantage. The State noted that the jury convicted the Petitioner of a lesser-included offense of first degree murder.

The post-conviction court took the matter under advisement and issued a written order denying the post-conviction petition on January 24, 2020. Relative to self-representation, the post-conviction court noted the Petitioner's "conclusory statement that he should have been allowed to represent himself." The court found that the Petitioner had a team of three attorneys and that "he received very active, capable representation during the long period prior to trial." The court noted that trial counsel enlisted the help of other Assistant Public Defenders for "various special tasks." The court found that the Petitioner had not shown how representing himself would have benefitted him. Relative to the decision to testify, the court found that the Petitioner was "intimately familiar" with the proof and that trial counsel spent much time preparing the Petitioner to testify, including a discussion of the "pros and cons" of testifying. The court found that the Petitioner "overlook[ed] the fact that he alone [could] make the decision whether or not to testify" and that the Petitioner blamed trial counsel for "his own decision." The court noted that the Petitioner "blame[d] everyone but himself for the death of his daughter." The court found that the Petitioner avoided a "much more severe conviction and sentence" as a result of trial counsel's efforts. The court concluded that the Petitioner's "lack of satisfaction" did not equate to deficient performance or a prejudicial result. The Petitioner timely appealed.

ANALYSIS

On appeal, the Petitioner contends that the post-conviction court erred by dismissing his post-conviction petition, arguing that he was denied the right to self-representation and that trial counsel provided ineffective assistance by failing to warn the Petitioner that the State could present rebuttal testimony if he testified. The State responds that the Petitioner waived his first issue for failure to raise it on direct appeal and that trial counsel provided effective assistance.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

*A. Self-Representation*

We agree with the State that consideration of the Petitioner's freestanding self-representation issue has been waived for failure to raise it on direct appeal. Tenn. Code Ann. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented" unless factors exist which do not apply here); see Grindstaff v. State, 297 S.W.3d 208, 219 (Tenn. 2009) (acknowledging the statutory directive for waiver).

In its appellate brief, the State discusses at some length that this court should not consider the self-representation issue in the context of ineffective assistance of appellate counsel. During the post-conviction hearing, the State lodged an objection to the self-representation issue because the Petitioner had not raised it on direct appeal. Post-conviction counsel briefly responded to the objection by acknowledging the possibility that

the issue could be raised as bearing on the effectiveness of appellate counsel, but post-conviction counsel made no further argument on the topic and did not question the Petitioner about the appellate proceedings. Likewise, appellate counsel did not testify at the post-conviction hearing.

Initially, we note that the Petitioner has not raised or briefed such an issue on appeal, and he did not file a reply brief addressing the State's argument. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); Tenn. R. App. P. 27(a)(7) (stating that an appellate brief must contain an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities and appropriate references to the record" and "for each issue, a concise statement of the applicable standard of review"). Moreover, the post-conviction court did not make findings of fact or conclusions of law related to the effectiveness of appellate counsel. Tenn. R. App. P. 36(a) (stating that this court may not grant relief "in contravention of the province of the trier of fact"). As such, we conclude for the sake of thoroughness that this issue has been waived.[5] The Petitioner is not entitled to relief on this basis.

### b. Ineffective Assistance of Trial Counsel

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at

---

[5] We note that "the plain error rule, which would otherwise permit an appellate court to address the issue sua sponte, may not be applied to post-conviction proceedings to grounds that would otherwise be deemed either waived or previously determined." Grindstaff, 297 S.W.3d at 219 (citing State v. West, 19 S.W.3d 735, 756-57 (Tenn. 2000)).

the time." Id. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In this case, the record supports the post-conviction court's finding that trial counsel and the Petitioner extensively reviewed the State's evidence prior to trial and discussed the benefits and disadvantages of testifying. Trial counsel enlisted Mr. Johnson to cross-examine the Petitioner aggressively and demonstrate tactics the prosecutor might use to upset the Petitioner at trial. Trial counsel testified that the Petitioner's anger, which counsel described as genuine and organic, was useful to gain sympathy from the jury. This tactic was at least partially successful, and the jury found the Petitioner guilty of the lesser-included offense of criminally negligent homicide in spite of also finding him guilty of the underlying offense supporting first degree felony murder, aggravated child neglect. This result was remarkable due to the horrifying and gruesome circumstances of the victim's death and the graphic evidence of her injuries.

We note that even discounting the rebuttal testimony, several police witnesses reported the Petitioner's screaming at co-defendant Ruth, refusing to drive her to the hospital, and making statements to a police officer about doing "something" to co-defendant Ruth if anything happened to the victim. The Petitioner's anger issues came in through other evidence, but trial counsel sought to place those strong emotions in a more favorable context through the Petitioner's testimony. The Petitioner has not shown that trial counsel's performance was deficient in this regard. Indeed, the record supports the post-conviction court's finding that counsel made a reasonable, tactical decision based upon adequate preparation that ultimately benefitted the Petitioner. The Petitioner is not entitled to relief on this basis.

## CONCLUSION

Based on the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE